Ryan R. Grace                                    *Attorney for the Plaintiff*
PA Attorney ID# 307192
126 W. Miner Street
West Chester, PA 19382
(610) 314 - 7066

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| CAMERON SMITH, | : | |
| *PLAINTIFF* | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION- AT LAW |
| SYNCREON.US.INC | : | No.    2022 – CV – 00744 |
| *DEFENDANT* | : | JUDGE JENNIFER P. WILSON |

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Filed: May 19, 2023

# <u>TABLE OF CONTENTS</u>

**Section** **Page**

Summary of Argument ……………………….…………….…………1

Factual Background …..………………………………………...…………3

Standard of Review …..…………………………………….…………6

Argument …………………………………………………7

   I.    Plaintiff was an Employee of the Defendant for Purposes of the Civil Rights Act………………………………………7

   II.    Plaintiff Suffered Severe and Pervasive Racial Hostility in Defendant's Workplace ……………….………………….........13

   III.   The Defendant Failed to Respond Adequately to the Racial Hostility in Its Workplace …………….……………………22

Conclusion …………………………………………….………25

Institutionalized hostility toward African Americans is an indelible stain on the noble fabric of the American Experiment. After racial inequality was painfully exorcised from the Constitution itself in 1865, African Americans were quickly rendered second class citizens by a myriad of policies and customs that touched on almost every aspect of life. So when Congress passed the Civil Rights Act in 1964, it included Title VII "for the ameliorative purpose of eradicating prohibited forms of discrimination from the workplace." *Martin v. United Way of Erie Cnty.,* 829 F.2d 445, 449 (3d Cir.1987). "Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, (1973).

Just like insidious rules about water fountains and public transportation, discrimination at work was ultimately enforced by a certain threat, of the same consequence for anyone that tried to resist white supremacy: death by lynching. The short rope and violent demise that awaited a person who failed to embrace racial discrimination was the spine and the backbone of Jim Crow. Widespread practice of lynching was nothing short of "racial terrorism" and it "has contributed to a legacy of racial inequality," *Statement to the Media by the United Nations'*

*Working Group of Experts on People of African Descent,* 29 January 2016, https://www.ohchr.org/en/statements/2016/01/statement-media-united-nations-working-group-experts-people-african-descent?LangID=E&NewsID=17000.

The Plaintiff here is an African American man and he suffered pervasive racial hostility while working in a factory owned and operated by the Defendant. That abuse culminated in what may be the most vile and severe form of American racial animus, when a Caucasian co-worker, who frequently displayed a Confederate flag in the workplace, directly threatened to lynch the Plaintiff for violation of workplace rules. The Defendant failed to address the racial hostility that regularly existed on its factory floor until it ultimately exploded into a direct threat of racial violence, causing enormous psychological and economic damage to the Plaintiff.

The Defendant now asks this Honorable Court to grant summary judgment on Plaintiff's Civil Rights Act claim. It argues first that the Plaintiff was not an employee for Title VII purposes and, second, that he cannot establish there was a hostile work environment. However, there is significant evidence in the record that tends to show the Defendant

controlled Plaintiff's employment to such a degree that he was an employee under Title VII; and the record is rich with evidence of severe and pervasive workplace hostility that will provide a basis for, and even compel, a reasonable jury to enter a verdict in favor of the Plaintiff. He therefore respectfully asks this Court to deny the Defendant's Motion for Summary Judgment and to send the evidence of this Defendant's racially hostile workplace to trial by jury.

Factual Background

Plaintiff, Cameron Smith, is a 44 year old African American man, father of 6 children, and a skilled laborer that works for a personnel supply firm called Strom Engineering. That company provides no services of its own, but rather it supplies other companies with skilled labor in a broad range of fields. In September 2021, the Plaintiff was assigned to a 60 day project for the Defendant, syncreon.US.inc., at its facility in York, PA on an hourly basis, and far from his family home in the mid-west.

The York, PA facility of syncreon.US.inc. produces motors and machine parts used in the venerable American product, Harley Davidson

motorcycles. The Plaintiff was working as a quality control technician in one of the factory sections producing those parts at the Defendant's facility. In a very standard form of economic relationship, he was technically employed by a staffing agency but was wholly engaged in job assignments consisting of the Defendant's regular business operations.

Carl Conser (hereinafter "Conser") is a 59 year old Caucasian man and was a co-worker with the Plaintiff in the Defendant's factory. Conser, the Plaintiff, and other co-workers—including Defendant's supervisors— worked in close quarters. There in the workplace, Conser regularly displayed an image of the Confederate flag through one of the most omnipresent items of modern life, the bright high definition background screen of his cell phone. The Plaintiff was required to work alongside a co-worker, openly brandishing one of the most infamous and direct symbols of white supremacy in a place that management did or should have seen.

The subtle, yet terrifying, racial hostility exuded by the Confederate flag, alone, could be actionable discrimination in a workplace. It is a logical and historical possibility that an individual who flies that particular flag is also an individual that goes further, and burns

crosses, or lynches people. The Plaintiff's co-worker, who was flaunting the Confederate flag, did take it further.

On September 17, 2021, the Plaintiff and another African American employee were jokingly claiming to be so skilled at their jobs that it was unnecessary for them to focus on all the workplace protocol. At that time, Conser interjected and stated directly to the Plaintiff "you need to follow the rules, or you get lynched."

There is no dispute that Conser uttered that statement. His specific intent at the time is unclear; but in the immediate aftermath, he "unapologetically" confirmed that he said his African American co-worker would be lynched for failing to follow factory rules, and insisted that he and others "talk like that all the time." The Defendant finally did what it should have done when Conser first displayed known racist symbols on its factory floor, and it removed him from the workplace.

However the effect of incendiary racial violence was already seared into the Plaintiff. The direct threat of a historic instrument of terror coming from a co-worker that displayed the Confederate flag for all to see gripped the Plaintiff and his family with a stark fear that he may have

found himself working in establishment—far from home—that truly condones white supremacy and where he truly is unsafe.

After his terrible rotation in the Defendant's York, PA facility, the Plaintiff stopped working "on the road," for whatever project in the country that needed him most and paid him best. Accepting only work opportunities closer to home, he now makes significantly less money and is limited—by reasonable fear of racial violence—from the full participation in interstate commerce to which he is entitled and of which Title VII of the Civil Rights Act was created to ensure.

Standard of Review

Summary Judgment is only appropriate if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," *Fed.R.Civ.P. 56(c)*, *DL Res., Inc. v. FirstEnergy Solutions Corp.,* 506 F.3d 209, 216 (3d Cir. 2007). "The court may not, however, weigh the evidence or make credibility determinations," *Pichler v. UNITE*, 542 F.3d 280, 286 (3d Cir. 2008), and it "must view the evidence in the light most favorable to the non-moving party," *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

<u>Argument</u>

I.   <u>Plaintiff was an Employee of the Defendant for Purposes of the Civil Rights Act</u>

Before even attempting to argue that its factory in York, PA was not a racially hostile workplace, Defendant asserts that it had no obligation to ensure the Plaintiff was spared racial discrimination when working at its facility and on its own regular projects. In support of this position, Defendant points to *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114 (3d Cir. 2013), wherein our Circuit Court of Appeals actually rebuked that type of argument. The Court in *Covington* observed that "instead of meeting [the Plaintiff's] discrimination allegations, the defendants argue they are not covered by the provisions of antidiscrimination statute because they are not encompassed within the definitions of the relevant statutes; in other words, they are free to discriminate," <u>Id</u>., at 118.

The Plaintiff here is engaged in a very common form of business arrangement, where is technically engaged with a staffing agency but works on projects entirely for other companies, and not simply

performing a task at that company's facility. Rather than relying on whether a boss chooses to call a worker "employee," our courts use factors to determine if a business and its laborer have a legally cognizable employer-employee relationship.

The Supreme Court pronounced six factors to consider "determining who qualifies as an *employee*" in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 381 (1992). Those are: (1) duratiom of the relationship; (2) whether the the hiring party can assign work to the hired party; (3) the method of payment; (4) whether the work was part of the regular business of the hiring party; (5) provision of employee benefits; (6) tax treatment of the hired party, Id., at 323. There is clear evidence in the record here supporting the conclusion that Plaintiff was an employee, with support of multiple factors.

The Third Circuit distilled the analysis to three factors in *Faush v. Tuesday Morning Inc.*, 808 F.3d 208 (3d Cir. 2015): (1) who paid the individual's salary; (2) who hired and could fire the employee; (3) who had control over the employee's daily employment activities, Id., at 215. With both tests, naturally, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive," Id. at 214,

quoting *Darden*, 530 U.S. at 324, and when considering summary judgement, the issue of whether a worker qualifies as an employee under Title VII must be left to the jury "if reasonable minds could come to different conclusions on the issue," *Faush*, 808 F.3d at 215.

Our Court of Appeals in *Faush* ruled that the District Court's grant of summary judgment was inappropriate in a very similar factual scenario as the case at bar. The plaintiff there technically worked for a firm called Labor Ready and was assigned to a project for Tuesday Morning. Tuesday Morning paid Labor Ready, who then paid the plaintiff. The Court held "those payments were functionally indistinguishable from direct employee compensation," Id. because Tuesday Morning paid Labor Ready for each hour worked rather than for the completion of a discreet project, which is the "method by which independent contractors are often compensated," Id. at 216.

The Court also found the second factor, related to hiring and firing, at best "provided weak support for the Tuesday Morning's position" that Mr. Faush was not an employee, Id. It observed that even though "Tuesday Morning obviously did not have the power to terminate Faush's employment with Labor Ready" it did "have ultimate control over

9

whether [he] was permitted to work at its store," Id., at 216. The final factor of control over employment activities "overwhelmingly" favored the plaintiff in *Faush* because he "worked at a Tuesday Morning store, rather than at a remote site controlled by Labor Ready" and because "Tuesday Morning personnel gave Faush assignments, directly supervised him, provided site-specific training, furnished any equipment and materials necessary, and verified the number of hours he worked," Id.

Ultimately it was error for the District Court to grant summary judgment in *Faush* because "unlike a contractor relationship, in which an agency is hired to perform a discrete task and oversees its employees' work in the completion of that project, the Labor Ready employees were hired on an hourly basis to perform services under the supervision of Tuesday Morning management, which exercised control over the temporary employees' daily work activities," Id. Almost exactly the same thing can be said of the business relationship between the Plaintiff and Defendant here.

Strom Engineering, the staffing agency like Labor Ready in *Faush*, technically employed the Plaintiff. However, that company provides no services of its own. Instead, as the Defendant's own exhibits indicate,

"Strom's mission is to provide the highest qualified personnel to our customers" DOC 32-2, p. 88. It sends workers to businesses as varied as "capital equipment industry, foundry, food and beverage, transportation, construction and industrial supply as well as the hi-tech fields of computers, electronics, semi- conductors, telecommunications and special production machinery," Id.

Once at those other companies, workers like Plaintiff accept "assignments of limited duration which are performed under our customers' supervision or direction," DOC 32-2, p. 91. When the Plaintiff was dispatched to work at the Defendant's factory it was made clear that he would "be receiving work direction primarily" from the Defendant, DOC 32-2, p. 121. He was then required to submit weekly time records to "properly reflect the compensable hours worked," DOC 32-2, p. 124.

The essential aspects of employee life were also controlled by Defendant, since it determined Plaintiff's work schedule, DOC 32-2, p. 92, as well as the "timing, number, and length of meal and rest breaks," DOC 32-2, p. 93. Finally, it was also clear that the Defendant had unfettered ability to terminate the Plaintiff's work at its factory. The paperwork accompanying his assignment indicated that the Defendant

could "**END YOUR ASSIGNMENT AT ANY TIME FOR ANY LEGAL REASON.**," DOC 32-2, p. 91 (emphasis in the original).

Of course, "the extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor among the various factors that a court must consider," *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 37 (3d Cir. 1983). The Defendant here was in near total control of the means and manner of Plaintiff's work. Its agent, Josh Yashinski, remembered to pull the company line when he specifically denied considering himself Plaintiff's supervisor, DOC 32-2, p. 201; however he became more candid when later describing the day of the racial threat. Mr. Yashinski testified that on September 17, 2021, he was "overseeing Zone M and Zone I" and that the Plaintiff was working "in Zone I", DOC 32-2, p. 206.

There is unquestionably evidence that could lead a reasonable juror to conclude that Plaintiff was an employee under Title VII. In fact, careful and nuanced application of the *Faush* standard reveals there are facts in this record that can satisfy all three factors. The Plaintiff was paid hourly, to work at Defendant's factory, subject to Defendant's schedule, on Defendant's own and normal projects, using Defendant's equipment,

and under daily direction of the Defendant—up to and including when to take breaks. There is sufficient evidence, to warrant a trial, indicating that the Defendant employed the Plaintiff for Title VII purposes, that it had a legal duty to protect him from racism in its workplace, and that it is liable for failing to do so.

II.   <u>Plaintiff Suffered Severe and Pervasive Racial Hostility in Defendant's Workplace</u>

The Defendant's attempt to hide its hostile workplace from a jury, behind technicalities in the Civil Rights Act's definition section, is made worse by the fact that its hostility here was so severe that it boiled all the way to the point of a racist threat to commit murder. Moreover there exists additional evidence suggesting that the hostility was pervasive up to that point of an outright verbal assault.

a.  Facts in the Record Show that the Racial Hostility Against Plaintiff Was Severe

To survive summary judgment on a claim of workplace hostility, "the correct standard is 'severe *or* pervasive.' The Supreme Court has

articulated as much on several occasions. *See, e.g., Pa. State Police v. Suders*, 542 U.S. 129, 133, (2004); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, (1993)," *Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017). "Some harassment may be severe enough to contaminate an environment even if not pervasive," Id.

The Supreme Court dictates that "whether an environment is hostile requires looking at the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). The discriminatory conduct in the matter before this Honorable Court is nearly as extreme as possible in the workplace.

The threat of lynching has a special place within the horror of institutionalized racism. The victim was inevitably murdered, but often tortured first, in response to a perceived disrespect of white supremacy, by an African American or anyone for that matter. "State authorities often attempted to prevent lynchings, but seldom punished the mob participants," Robert A. Gibson. "The Negro Holocaust: Lynching and

Race Riots in the United States, 1880–1950". Yale-New Haven Teachers Institute, *https://teachersinstitute.yale.edu/curriculum/units/1979/2/79.0 2.04/2*. "Lynchers were rarely ever indicted by a grand jury or sentenced," and "if sentenced, the participants in the lynch mobs were usually pardoned," Id.

The fact that this horrible crime—specifically intended to enforce discriminatory customs—was so often accepted by the community made it a tool of racial oppression so effective that the threat of lynching still haunts and terrorizes a reasonable African American to this day. The practice was so horribly effective its destructive effects remain baked in our culture and communities. It led to "disfranchisement, social, educational and employment discrimination, and peonage. Deprived of their civil and human rights, Blacks were reduced to a status of quasislavery or 'second-class' citizenship," Id.

When someone is threatened with lynching at work, it naturally "interferes with their ability to work," *Harris*, 510 U.S. at 23. In the present case, that threat destroyed the Plaintiff's ability to work in Defendant's facility, and in fact forced him to modify his entire career. In his deposition, Plaintiff explained that even as the emotional pain started

to heal, his family remained terrified of him taking short assignments all over the country. Instead, he now stays close to home, making significantly less money and causing strain on his family in general, DOC 32-2, p. 37, p. 52-54.

### b. There is Evidence that the Racial Hostility against Plaintiff was Pervasive

While Defendant attempts to minimize a direct threat of murder enveloped in historic racist animus as a mere isolated incident, there is evidence in the record that could permit a reasonable jury to find that form of discrimination was so severe that it created a hostile workplace. Additionally warranting a denial of summary judgment, discovery revealed and confirmed the existence of evidence showing the discrimination in Defendant's facility was pervasive.

Prior to threatening to murder the Plaintiff, Conser displayed in the workplace his support, or at least acceptance, of racial discrimination. In fact, he literally displayed it brightly and clearly, frequently visible to the Plaintiff and everyone around him. The Plaintiff testified that

Conser's cell phone clearly displayed the Confederate Flag and that it was constantly out and visible, DOC 32-2, p. 52-53.

Once again Mr. Yashinski firmly gripped the company line. When asked in his deposition if he ever saw Conser display the Confederate Flag on his cell phone, Mr. Yashinski's pointed out that the Defendant had a rule against cell phones use by employees on the factory floor and then testified he doesn't "recall seeing a Confederate [phone] case,"† DOC 32-2, p. 215. However, Conser was later interviewed by Plaintiff's counsel. He confirmed that, in September 2021, his cell phone background screen was an image of the Confederate Flag and that, despite the rule about cell phones, he regularly displayed it work, DOC 32-3, p. 17.

In addition to confirming that he "frequently" displayed a Confederate Flag at work "visible to other employees," DOC 32-3, p. 17, Conser admitted that he made comment about lynching the Plaintiff on September 17, 2021. Moreover he confessed that he and other employees

---

† Discovery confirmed, *after Mr. Yashinski's deposition*, that the Confederate Flag displayed by Conser in the workplace was actually an image on the background screen of Conser's cell phone and not, as the Plaintiff had thought, an image on Conser's cell phone case. Therefore, there is a genuine question of a material fact that can be asked of Mr. Yashinski at trial regarding whether he ever saw the Confederate Flag displayed in the workplace on Conser's *screen* since he made sure in his deposition to specify that he did not recall seeing one displayed on a phone *case*.

made "similar statements" in the workplace "on a regular basis," DOC 32-3, p. 17, and that Defendant's management "heard and were aware" of those statements, Id.

Defendant's counsel tries to rehabilitate Conser's contribution to discovery with a supplemental statement. There he nonsensically claims that, in admitting "similar statements" to his lynching comment he intended to mean that he prior made other jokes in the workplace unrelated to race. DOC 32-2, p. 242. He also asserts that, when displaying the Confederate Flag, he did not intend to communicate racial bias or intimidation, Id. at 243.

At best for the Defendant, Conser's second statement creates genuine questions of material fact about exactly what "similar statements" were regularly made in Defendant's factory. At worst, Conser's second statement reveals that the Defendant truly is just as racially hostile as the Plaintiff alleges—as it shamefully offers into evidence an affidavit that attempts to conceive of jokes one could reasonably call "similar" to a comment about lynching an African American man.

It strains credulity that Conser did not intend to communicate racial bias or intimidation when he displayed the Confederate Flag on the factory floor or when told the Plaintiff he would be lynched for failing to follow workplace rules. Once again, at best for the Defendant, this spurious claim only creates a genuine question of material fact. Moreover, Conser's intent is beside the point. The simple fact is that the Confederate Flag is a symbol of racial bias, and it has been used for racial intimidation—often literally right alongside the murderous practice of lynching. The point in this case is that the Defendant permitted those things to exist in its workplace.

Discovery here revealed evidence tending to show that, far more likely than the self-serving contents of his second statement, Conser often made created racial hostility in the Defendant's factory. The Plaintiff testified that multiple other people warned him about Conser being a racist, DOC 32-2, p. 39, p. 61. He even testified that Mr. Yashinski—in the immediate aftermath of the lynching threat and before he getting his hands around the company line—admitted to him that Conser was a known problem, DOC 32-2, p. 42.

The Defendant goes to great lengths to argue that this Court should disregard the experiences of racism others had in the Defendant's workplace. It asserts that "Title VII law is well established: plaintiffs can only recover for their own workplace experiences, and not the experience of others," DOC 32, p. 28. However the cases cited do not support this position; it is more precise to say that plaintiffs cannot recover for the experience of others *alone*.

The Defendant accurately quotes *Felder v. Penn Mfg. Indus.*, 182 F. Supp. 3d 203 (E.D. Pa. 2016) when it writes, "racist comments solely directed toward others and made outside of Plaintiff's presence cannot alone prove the first element of a hostile work environment claim," DOC 32, p. 32. Yet the rest of the quote is informative for the present matter. The Court in *Felder* continued, "…however, evidence of those comments may be considered in determining whether facially neutral conduct on the part of the defendant was actually based on race," *Felder* 182 F. Supp. 3d at 209.

Rather than instructing this Court to put blinders on when it comes to the experience of others, the cases cited by the Defendant stand for the

proposition that, to have a claim under Title VII, a plaintiff must personally experience discrimination.

In *Carver v. City of Trenton*, 420 F. 3d 243 (3d Cir. 2005) "no racist comment, written or spoken, was ever directed at [the plaintiff]," Id. at 263. In *Junkins-Hopkins v. Johns Hopkins Hosp.*, co-workers of a plaintiff made racist comments outside her presence and she did not even learn of those comments until after she left employment, *Junkins-Hopkins v. Johns Hopkins Hosp.*, No. 14-07080, 2015 U.S. Dist. LEXIS 67849.

Defendant cites no authority that suggests this Court should refuse to consider evidence, from sources other than the Plaintiff, that Conser created racial hostilities in the workplace. Rather, as instructed by the Supreme Court, determining "whether an environment is hostile requires looking at the totality of the circumstances," *Harris*, 510 U.S. at 23, which naturally includes the experience of others. The credibility and specific details of others' experiences creates, once more, a genuine question of a material fact.

III.   <u>The Defendant Failed to Respond Adequately to the Racial Hostility in Its Workplace</u>

The final way that the Defendant attempts to side step its violation of the Civil Rights Act is arguing that the Plaintiff cannot establish Respondeat Superior liability. Boasting about the its "undisputedly effective and timely response to Plaintiff's singular report of hostility," DOC 32, p. 33, the Defendant pretends that it is only liable for racial discrimination in its workplace that has formally been reported. However, it goes on to cite authority that makes clear employers are liable for discrimination of which they knew—or should have known.

It is true that "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint," *Huston v. Procter & Gamble Paper Products Corp.,* 568 F.3d 100, 104 (3d Cir. 2009). It is also true that the Defendant has policies regarding avenues for complaint. However employer liability for co-worker harassment also exists "if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action," <u>Id</u>.

As outlined previously, there is ample evidence of—and at least genuine questions regarding—Conser being known to other employees and management as a source of racial hostility. In addition, Conser admits in discovery that he regularly made statements in the workplace similar to his reprehensible comment about lynching. Just as there is, at least, a genuine question of how exactly those other statements were similar, there is also a genuine question about whether Conser's supervisors knew or should have known he was making those statements.

Beyond even words, though, the record has clear evidence that the Confederate Flag was regularly and noticeably displayed in its workplace. The Plaintiff himself saw it almost every day they worked together. He offered clear evidence of the workspace's physical layout and the manner in which the Confederate Flag on Conser's cell phone was visible to many workers, including Defendant's management, DOC 32-2, p. 56-57.

Rather than "*supposition* that syncreon supervisors personally saw Conser's cell phone," the record contains *circumstantial evidence* that they did. At the very least, there is a genuine question of whether the

Confederate Flag—perhaps the most famous symbol of the racial fault line in America—was regularly on display in Defendant's factory. If it was, then it certainly becomes something the Defendant knew or should have known.

In addition to possible Respondeat Superior liability based on evidence that the Defendant knew or should have known about Conser's racist behavior, a reasonable jury could also find Respondeat Superior liability based on the fact that "employers are liable for torts committed by employees within the scope of their employment." *Knabe v. Boury Corp.,* 114 F.3d 407, 411 (3d. Cir. 1997).

The Confederate Flag was visible at work and while working; but more importantly, the threat to lynch the Plaintiff was made directly in furtherance of workplace rules. Conser denies he was being serious when he threatened to lynch the Plaintiff, but there is at least a genuine credibility question about whether that's the truth.  The lynching threat, directly coupled with enforcing workplace rules, is precisely the kind of institutionalized racist behavior, for which the Civil Rights Act holds employers liable.

Conclusion

The facts in the case at bar are precisely what Congress sought to prevent when it passed Title VII. Cameron Smith is a family man and a skilled laborer. He provided for his family by fully participating in the American labor force—working in any state, wherever the economy needed him most. Now however, due to racism in the workplace, he is removed from inter-state commerce. That removal has caused economic pain to the Plaintiff and his family in addition to the emotional toll of the racist assault. However, more broadly, Congress specifically sought to eliminate the chilling effect that discrimination has on national movement of people, goods, and services with the Civil Rights Act.

The Defendant must not be allowed to sidestep trial where the record creates a genuine question of whether it is liable for a violation of Title VII that goes directly to the heart of the legislative intent behind the Civil Rights Act. There are more than sufficient facts to support a finding that the Plaintiff was an employee of the Defendant, that he experienced a hostile workplace, and the Defendant is liable for that

hostility. Therefore, this Honorable Court should deny the Defendant's

Motion for Summary Judgement and send this matter to trial.


Respectfully Submitted,



Dated: ___5/19/23___          By: _____

Ryan R. Grace
Attorney I.D. No. 307192
126 W. Miner Street
West Chester, PA 19382
610-314-7066

*Attorney for the Plaintiff*

26

## CERTIFICATE PURSUANT TO LOCAL RULE 7.8

I, Ryan R. Grace, attorney for the Plaintiff, hereby certify that the foregoing Brief in Opposition to Defendant's Motion for Summary Judgement complies with Local Rule 7.8 because it contains 4,958 words.

Dated: _____5/19/23_____        By: _____

Ryan R. Grace
Attorney I.D. No. 307192
126 W. Miner Street
West Chester, PA 19382
610-314-7066

*Attorney for the Plaintiff*