## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAMERON SMITH, | : | No. 1:22cv744 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| SYNCREON.US, INC., | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court is a motion for summary judgment filed by Defendant syncreon.US, Inc. in this employment discrimination action filed by Plaintiff Cameron Smith pursuant to Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e, *et seq.* (Doc. 31).  The motion is ripe for a decision.

## Background

Defendant operates a manufacturing facility in York, Pennsylvania, assembling parts for Harley Davidson motorcycles.[1] (Doc. 32-1, SOF ¶ 4). Between September 3, 2021 and November 4, 2021, non-party Strom Engineering Corporation ("Strom") assigned plaintiff to work in defendant's facility on a 60-day assignment. (Id.)

---

[1] Unless noted otherwise, the court cites to the defendant's concise statement of material facts ("SOF"), (Doc. 32-1), for facts which the plaintiff admitted in its response to the SOF, (see Doc. 35-1).  All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

Plaintiff was a contract worker. (Doc. 32-2, Def. Ex. A., Pl. Dep. 12:22-25). He is African American. (Doc. 5, Am. Compl. ¶ 2).  According to the plaintiff, upon his arrival to defendant's facility, another contract worker (also African American) warned the plaintiff that one of defendant's workers, Carl Conser, was racist and had a Confederate flag on his phone. (Doc. 32-2, Def. Ex. A., Pl. Dep. 56:15:57:12).  Per plaintiff, he was warned that Conser said things "thinking people don't understand what he's saying, racism type stuff." (Id., 57:4-12).

Plaintiff worked as a quality control auditor at defendant's facility, meaning other workers assembled motorcycle motors and plaintiff ensured that parts were placed on correctly with no damage. (Id., 17:1-10; Def. Ex. C., J. Yashinski Dep. 18:10-18).  Conser worked in the same area of the facility as plaintiff but was directly employed by the defendant. (Def. Ex. C., J. Yashinski Dep. 17:17-18:9).

Plaintiff and Conser worked the same shift for a period of one week. (Doc. 32-1, SOF ¶ 23).  Each day, plaintiff observed a Confederate flag on Conser's cell phone, which Conser kept on a desk in a common work area. (Doc. 32-2, Def. Ex. A., Pl. Dep. 36:21-24, 52:20-22).  Conser admitted having the flag displayed as a screensaver. (Doc. 32-1, SOF ¶ 74).

Plaintiff and Conser worked a shift from 11:00 PM to 7:00 AM on September 16-17, 2021. (Id. ¶ 29).  In a written statement, plaintiff recounted:

> I, Cameron Smith was holding a conversation with Kyle [St. Cyr] in the PTO1 area.  It was a silly conversation about

2

> following rules.  I then stated to Kyle in a joking manner
> that we don't follow rules.
>
> Carl, then intervenes in our conversation and says "Follow
> the rules or get lynched"
>
> I never had a problem or issue inside the facility, I do my
> job, Im here everyday, And I feel that was very
> unprofessional.  [sic]

(Id. ¶¶ 34-35)(formatting modified).

After Conser made that statement, plaintiff turned to Conser and yelled,

"Man, don't ever say no shit like that to me again." (Doc. 32-2, Def. Ex. A., Pl.

Dep. 23:3-7).

A supervisor employed by defendant overheard plaintiff yelling, approached

the two individuals, and separated them. (Doc. 32-1, SOF ¶ 33).  That supervisor

and three of defendants' other employees ultimately intervened and had plaintiff,

Conser, and St. Cyr write statements. (Doc. 32-2, Def. Ex. H., J. Yashinski

email).  In Conser's written statement, Conser admitted to telling the plaintiff that

plaintiff "better be right or [plaintiff would] get linched [sic]." (Doc. 32-1, SOF ¶

36).  One of defendant's other employees emailed defendant's human resources

("HR") department about the incident. (Doc. 32-2, Def. Ex. H., S. Otto email).  Per

the email, Conser stated during the investigation that "he talks like this all the

time" and other "operators in [the department do as well." (Id.)  Conser also

stated that he would not "say the 'N' word because this is work." (Id.)

Defendant terminated Conser less than twenty-four hours later. (Doc. 32-1, SOF ¶¶ 44, 48).   Plaintiff completed his 60-day work contract at defendant's facility without additional incident. (Id. ¶ 59).

Based on the above facts, plaintiff's amended complaint asserts a hostile work environment claim.  Following discovery, defendant filed the instant motion for summary judgment.  Having been fully briefed, the defendant's motion is ripe for disposition.

**Jurisdiction**

Because this case is brought pursuant to Title VII, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Standard of Review**

The defendant has filed a motion for summary judgment.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410, n. 4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the

4

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law. Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

"In employment discrimination cases, the summary judgment standard is 'applied with added rigor' because 'intent and credibility are crucial issues.' " Walden v. St. Gobain Corp., 323 F.Supp. 2d 637, 641 (E.D. Pa. 2004)(quoting Stewart v. Rutgers Univ., 120 F.3d 426, 431 (3d Cir. 1997)).

## Analysis

The defendant's motion for summary judgment is relatively straightforward. Defendant seeks judgment in its favor on the hostile work environment claim based upon two arguments: 1) the defendant cannot be liable under Title VII because it did not directly or jointly employ the plaintiff; and 2) even if plaintiff could establish that defendant was his joint employer, plaintiff's hostile work environment fails based on all undisputed material facts.  The court will address these arguments in order.

### 1. Joint Employment

Title VII states that "[i]t shall be an unlawful employment practice for an employer -- … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e–2(a).  In this case, the plaintiff executed a contract with Strom and Strom placed plaintiff at defendant's manufacturing facility.  In order to state a Title VII claim here, the plaintiff must demonstrate an employment relationship

6

with the defendant. See Covington v. Int'l Ass'n of Approved Basketball Offs.,

710 F.3d 114, 119 (3d Cir. 2013).

To determine whether an employment relationship applies for the purposes

of Title VII, the multi-factor test from Nationwide Mut. Ins. Co. v. Darden, 503

U.S. 318 (1992) applies. Faush v. Tuesday Morning, Inc., 808 F.3d 208, 213 (3d

Cir. 2015).  The Darden factors aid an inquiry into whether the common law of

agency would recognize a master-servant relationship. Id. at 214 (footnote

omitted). The non-exhaustive list of factors from Darden include:

- the skill required;
- the source of the instrumentalities and tools;
- the location of the work;
- the duration of the relationship between the parties;
- whether the hiring party has the right to assign additional projects to the hired party;
- the extent of the hired party's discretion over when and how long to work;
- the method of payment;
- the hired party's role in hiring and paying assistants;
- whether the work is part of the regular business of the hiring party;
- whether the hiring party is in business;
- the provision of employee benefits; and
- the tax treatment of the hired party.

See 503 U.S. at 323–24 (quotation marks and citation omitted).

Despite the above articulation of factors, "all of the incidents of the

relationship must be assessed and weighed with no one factor being decisive."

Id. at 324 (quotation marks and citation omitted).

7

Before evaluating the summary judgment record, the court further notes that "[t]wo entities may be 'co-employers' or 'joint employers' of one employee for purposes of Title VII." Faush, 808 F.3d at 215 (citing Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997). Moreover, the question of whether the defendant was the plaintiff's employer "must be left to the jury if…reasonable minds could come to different conclusions on the issue." Id. (citing Graves, 117 F.3d at 729; Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1348 (3d Cir. 1991)).

The parties' briefs highlight the factors and facts of record that are most favorable to their positions. But, as discussed next, the evidence relied upon by the plaintiff is sufficient to preclude summary judgment on the issue of an employment relationship. To aid the discussion, the court will address the relevant and applicable Darden factors in two parts under the umbrella terms of compensation and control.

### a. Factors Pertaining to Compensation

A cluster of Darden factors focuses on the financial aspects of the relationship: the method of payment; the provision of employee benefits, and tax treatment, along with similar considerations. Plaintiff concedes he was employed and compensated by Strom and did not receive any benefits from the defendant. (Doc. 32-1, SOF ¶¶ 6, 9). These factors all would favor a finding that the defendant was not plaintiff's employer. Nonetheless, these compensation factors

8

should not be "overstated" by district courts. <u>Faush</u>, 808 F.3d at 215.  In light of the other considerations in this case, these facts are not dispositive.

### b. Control Factors

There are several additional <u>Darden</u> factors to consider. The Third Circuit has referred to these considerations using a shorthand description: "control." <u>See</u> <u>Faush</u>, 808 F.3d at 216 & n. 7.  Those factors focus on the skill required, the source of the instrumentalities and tools, whether the hiring party can assign additional projects to the hired party, and the extent of the hired party's discretion over when and how long to work. Faush, 808 F.3d at 216, n. 7 (citing <u>Darden</u>, 503 U.S. at 323–24).  In this case, other relevant <u>Darden</u> factors can be grouped with this portion of the analysis, including location of work, duration of assignment, and considerations related to business activities.  For brevity, the court will also consider the authority of the defendant to hire or fire the plaintiff in this section.

As for location, it is undisputed that plaintiff did not work at a Strom facility; he worked at defendant's manufacturing plant in York alongside defendant's other employees, including Conser and St. Cyr.  (Doc. 32-1, SOF ¶¶ 22, 30; Doc. 32-2, Def. Ex. A., Pl. Dep 21:17-23).  It is also undisputed that plaintiff was hired

9

to work at defendant's facility for sixty (60) days on a temporary assignment.[2] (Doc. 32-1, SOF ¶ 9).

As for the skill required, plaintiff was training defendant's employee, Conser, on the aspects of the plaintiff's quality control tasks. (See Doc. 32-2, Def. Ex. A., Pl. Dep. 27:6-12).  An employee of defendant named Wendy trained plaintiff to perform the tasks required and then she moved to another part of the plant. (Id. 37:10-17, 38:15-39:9).

Defendant also provided the tools and instrumentalities required to perform the work.  Plaintiff worked in the assembly of Harley Davidson engines and the defendant provided plaintiff with the equipment to assemble and sequence motorcycle parts for shipping to the defendant's client. (Id. 52:23-53:7; Def. Ex. C, J. Yashinski Dep. 15:21-16:2, 25:17-26:1).  Plaintiff thus provided relief to the defendant as the defendant transitioned certain tasks from one of its directly hired workers to another in its workplace.[3]

---

[2] In Faush, a temporary employee worked in a retail store for ten (10) days and the staffing firm only provided temps to that store for one (1) month.  808 F.3d at 210.  Contrary to the defendant's advocacy in this case, the short-term nature of a temporary employment assignment is not dispositive of an employee-employer relationship for the purposes of Title VII. Id. at 215–220 (vacating summary judgment entered in favor of the retail store).

[3] Two other Darden factors consider whether the work is part of the regular business of the hiring party and whether the hiring party is in business.  As the defendant acknowledges: plaintiff was hired to work on the floor in defendant's facility by Strom; Strom's regular business was to provide temporary workers for such assignments; and plaintiff "was obviously performing work that was needed to serve [defendant]." (Doc. 32, Def. Br. in Supp. at 9).

Regarding hiring and firing, plaintiff does not dispute that he applied and was hired by Strom to work the temporary assignment. (Doc. 32-1, SOF ¶ 3-4, 10).  Strom also could fire the plaintiff. (Doc. 32-2, Ex. B, Project Assignment Agreement).  But under the arrangement in this case, Strom's customer, the defendant, could also end plaintiff's assignment "at any time for any legal reason." (Id., Strom Employee Handbook, § 5.1)(formatting modified).  Consequently, if plaintiff did not perform up to the defendant's expectations, the defendant could send the plaintiff home.

Other relevant considerations are worthy of discussion here, as per Faush. See 808 F.3d at 216–17 (considering the defendant's "control over the temporary employees' daily activities").  On one hand, per the plaintiff, Strom employed two supervisors at defendant's facility while plaintiff worked there, a plant manager and coordinator. (Doc. 32-2, Ex. A., Pl. Dep. 17:15-24).  Strom's plant manager was on site during the shift when Conser made the statement to plaintiff about lynching. (See id. at 23:20-24:8).  In his deposition, plaintiff referred to Strom's plant manager as his boss. (Id. at 24:5-8).  Defendant's production supervisor, Joshua Yashinski, also testified that he was Conser's supervisor, but did not supervise the plaintiff. (Def. Ex. C., J. Yashinski Dep. 9:7-9, 9:25-10:9, 13:13-14:5).  But plaintiff also referred to Yashinski as "the boss." (Doc. 32-2, Ex. A., Pl. Dep. 23:3-19).

11

Yashinski also took the lead in addressing Conser's statement.  He heard plaintiff's loud response to Conser's statement and separated the two. (Doc. 32-1, SOF ¶ 33).  Per Yashinski's testimony, he: 1) asked the plaintiff to step away and explain the situation; 2) obtained written statements from the individuals involved; and 3) e-mailed the statements to defendant's HR department. (Doc. 32-2, Def. Ex. C., J. Yashinski Dep. 14:10-15:1).  According to Yashinski's email, three other individuals employed by the defendant also played a role in investigating the incident. (Doc. 32-2, Def. Ex. H., J. Yashinski email).  Both the plaintiff and Conser were sent home after the incident. (Id.)  The record does not reflect whether a Strom supervisor or one of defendant's supervisors dismissed plaintiff from the worksite.

Based on the plaintiff's testimony, Strom's project manager at the site was also involved in the investigation and wrote a statement about the incident. (Doc. 32-2, Def. Ex. A., Pl. Dep. 24:5-8, 41:3-25).  The summary judgment record, however, does not contain that written statement from the Strom manager or any other evidence that would suggest that Strom's manager played a role that would exclude defendant's supervisors from meeting with plaintiff, asking him questions about the incident, obtaining a written statement, and making remedial efforts.  In addition to firing Conser, the defendant could have also requested that the plaintiff be removed from the assignment by Strom.  It decided not to do so.

12

In considering the above factors under the umbrella term of "control," the plaintiff has responded to the motion for summary judgment with evidence supporting a joint employment scenario. See Doe v. McDonald's USA, LLC, 504 F. Supp. 3d 360, 365 (E.D. Pa. 2020)("A joint employment relationship exists when 'two entities exercise significant control over the same employees.' ") (quoting Graves, 117 F.3d at 727).  Regarding whether the defendant exercised day-to-day control over the plaintiff, there are genuine issues of material fact raised by the arrangement between Strom and the defendant and the ins-and-outs of how plaintiff was supervised.  As for the countervailing evidence emphasized by the defendant, such as Yashinski's testimony about supervision, a reasonable, rational jury may hear such testimony and not believe it based on the actual conditions at the facility.  They may also not believe the Yashinski's testimony based on how he took the lead in deescalating and investigating the incident.  Accordingly, the motion for summary judgment on this issue will be denied.

## 2. Hostile Work Environment

 The defendant also argues that summary judgment is warranted based on plaintiff's failure to satisfy the elements of a hostile work environment claim.  For the reasons set forth below, the court disagrees.

13

Title VII "may be violated when an employee's racist behavior creates a hostile work environment for his colleagues." Kengerski v. Harper, 6 F.4th 531, 537 (3d Cir. 2021). To succeed on such a claim under the law, "a plaintiff must show that 1) the employee suffered intentional discrimination because of his/her race, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability, meaning the employer is responsible." Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017)(quoting Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)(internal quotation marks and brackets removed).

Defendant asserts that plaintiff's evidence does not meet the severe or pervasive standard required under the law and further argues that plaintiff cannot establish employer responsibility. The court will address the record relative to these elements.

### a. Severe or Pervasive Discrimination

In making out a hostile work environment claim, "a plaintiff needs to show that the environment was actually hostile, i.e., that the offensive conduct at work was either 'severe' or 'pervasive.' " Kengerski, 6 F.4th at 537 (citing Castleberry, 863 F.3d at 264). In moving for summary judgment, the defendant focuses on the main incident involving Conser, arguing that Conser's statement about

14

lynching does not rise to the requisite level of severity under the law. In countering, the plaintiff argues that "the hostility here was so severe that it boiled all the way to the point" that Conser directed the statement about lynching to the plaintiff. (Doc. 35, Pl. Br. in Opp. at 13).

When determining whether an environment is sufficiently hostile or abusive, courts are directed to look at all the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Faragher v. City of Boca Raton, 524 U.S. 775, 787–78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "[T]he resolution of that question is context-specific[.]" Castleberry, 863 F.3d at 264 (citation omitted).

As to severity, "an extreme isolated act of discrimination can create a hostile work environment." Id. (citations omitted). As recounted by the plaintiff, Conser said to him, "follow the rules or get lynched." This is not a single use of a racial epithet or slur in the workplace. This statement can be construed as a direct physical threat. It is a statement evocative of extrajudicial killings and a racial hierarchy maintained by fear. It suggests that the system in place will not protect the plaintiff. Consequently, the seriousness of this statement is without question. Conser was terminated immediately.

15

Conser's statement also caused plaintiff to be sent home from his shift early. That shows Conser's statement "unreasonably interfere[d] with an employee's work performance." Harris, 510 U.S. at 23. With further context discussed above and below, a reasonable jury could find that the work environment was objectively hostile based on this single instance of severe conduct.[4]

### b. Employer Liability

Finally, this case involves racial harassment of the plaintiff by a coworker, not a supervisor. Defendant argues that the record fails to establish employer liability under the law, asserting that the plaintiff has no evidence that would support defendant's actual or constructive knowledge of Conser's conduct prior to the incident.

---

[4] The parties spend considerable time arguing whether the Confederate flag on Conser's cell phone screensaver demonstrates the pervasive discrimination required to make out a hostile work environment. Plaintiff concedes that he never complained about the workplace display of that symbol by the defendant's employee to Strom or to the defendant. (Doc. 32-1, SOF ¶ 71, 74). He also admits omitting reference to that situation in his administrative charge of discrimination with the Equal Employment Opportunity Commission. (Id. ¶ 76). Even still, a hostile work environment may proceed with evidence of severe or pervasive conduct. See Castleberry, 863 F.3d at 264. Conser's display of that symbol on his phone while working alongside plaintiff adds context to the severe nature of Conser's admitted conduct, as does Conser's indignance following the incident and statements to defendant's supervisor "that he talks like this all the time and...operators in the [department where plaintiff worked] do as well." (Doc. 32-2, Def. Ex. H., S. Otto email). As discussed in Section 2b, this evidence can also be considered for the purposes of employer liability.

16

"When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable." <u>Huston v. Procter & Gamble Paper Prod. Corp.</u>, 568 F.3d 100, 104 (3d Cir. 2009). "Under such circumstances, an employer is liable for the allegedly hostile work environment only if: (1) 'the employer failed to provide a reasonable avenue for complaint[,]' or (2) 'the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'" <u>E.E.O.C. v. Standard Reg. Co.</u>, 805 F. Supp. 2d 77, 85 (M.D. Pa. 2011)(quoting <u>Huston</u>, 568 F.3d at 104).

Neither party disputes that the defendant had a reasonable avenue for complaint. Thus, this case comes down to whether defendant knew or should have known of racial animus and harassment in the workplace and failed to take prompt and appropriate remedial action.

The record boils down to the testimony of a temporary worker versus the word of supervisor-level employees still employed by the defendant. As noted above, plaintiff testified that he was warned about Conser's racism by another Strom employee. (Doc. 32-2, Def. Ex. A, Pl. Dep. 57:4-12). Plaintiff also testified:

> Q.   Had Cosner [sic] created an aggressive environment from your perspective prior to this incident?
>
> A.   Well not really noticeably, but I used to hear him say little things like them, they. There was another young black guy I worked with and he'd, oh, he's fucking late. Excuse

17

my language.  He's fucking lazy. They need to get him out
of here.  And these people coming in here, you know, I
used to hear him say little things.  But that's neither here
nor there with me until something was ——

Q.   Do you know if he was referring to race, or he was
just referring to certain individuals generally?

A.   Well, he was referring to certain individuals. But like
you said whispers in the dark, things I heard. I'm putting
like he was referring to race.

(Id. 30:5-19).

Per plaintiff, Conser also displayed an image of the Confederate flag on his

cell phone, which plaintiff observed every day. (Id. 52:16-22).  Plaintiff testified

that Conser placed the phone in a visible location, on a computer desk in the

work area. (Id. 52:23-53:7).  As plaintiff indicated, the phone was in a location

visible to defendant's managers and supervisors when they walked through the

area during the workday. (Id. 53:21-25).  Plaintiff testified that the production

supervisor's desk was right across from where Conser kept his phone, and that

this supervisor, Yashinski, would be in a position to see the flag displayed on a

regular basis. (Id. 55:2-16).

On the other hand, Yashinski testified that he did not observe a

Confederate flag on Conser's cell phone. (See id., Ex. C., J. Yashinski Dep.

26:25-27:11 (referring to Conser's cell phone case)).  He also testified that he did

not hear Conser make any comments that could be perceived as racially

18

insensitive. (Id. 27:7-16). Plaintiff testified, however, that Yashinski told the plaintiff after the incident that the defendant had "problems with Carl before." (Id. Ex. A., Pl. Dep. 39:22-40-6, 53:21-54:3). Defendant's HR supervisor has supplied a declaration that those problems, if any, did not make its way into Conser's disciplinary record with the company. (Id. Ex. J., Decl. of A. Gittings ¶ 8).

For his part, Conser has provided conflicting declarations related to this incident. In his first declaration, supplied to plaintiff's counsel, he stated:

> 1) On September 17, 2021, I was employed at the Syncreon facility in York, PA.
>
> 2) On that day at Syncreon facility, I made a statement directly to another person employed at the facility, named Cameron Smith, which I intended to be a joke. The statement in question was: the other employee better do his work correctly or he would "get lynched."
>
> 3) Prior to that time, other employees and I made similar statements in the workplace on a regular basis.
>
> 4) Syncreon supervisors heard and were aware of those similar statements being made in the workplace on a regular basis.
>
> 5) Statements of that nature by employees were common and accepted in the Syncreon workplace.
>
> 6) Despite Syncreon having a rule against cell phone use in the workplace, the rule was almost never enforced; cell phones were commonly used and displayed by employees at the workplace. In

> September 2021, the background of my cell phone screen was a picture of the Confederate Flag. I frequently had my phone out and visible to fellow employees.

(Id., Def. Ex. M., C. Conser Decl. 03/29/2023).

This declaration by Conser confirms statements he made during the investigation "that he talks like this all the time and... operators in the [department where plaintiff worked] do as well." (Id, Def. Ex. H., S. Otto email).

But the declaration he later provided to counsel for defendant walks back some of these statements.  For example, he later declared:

> A.    With respect to the references to "similar statements" in paragraphs 3, 4, and 5, of the March 29th statement, I now add and clarify that:
>
> (i)    My reference to "similar statements" does not relate to statements relating directly or indirectly to race, racism, or racial hostility.
>
> (ii)   It is my intent that the phrase "similar statements" refers to statements made and/or intended in a joking manner directed to coworkers, unrelated to race.
>
> (iii)  The reference to "statements of that nature by employees," as in paragraph 5, does not refer to race-based, racist, or racially hostile statements but refers, instead, to statements made and intended as jokes.

(Id, Def. Ex. I., C. Conser Decl. 04/19/2023).

Under the law, constructive notice may be found "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." <u>Kunin v. Sears Roebuck & Co.</u>, 175 F.3d 289, 294 (3d Cir. 1999)(citation omitted).  Moreover, an employer cannot turn "a blind eye to overt signs of harassment."  <u>See</u> <u>id.</u>  A reasonable jury, looking at all the evidence, may conclude that Conser brought racial hostility into the workplace, directed such hostility to temporary workers who are African American, and defendant's supervisors looked the other way until Conser said something to the plaintiff that could not be ignored.  A reasonable jury may also consider Conser's conflicting assertions and believe that defendant's management-level personnel observed Conser's display of the Confederate flag and heard similar racist remarks and helped perpetuate the environment that plaintiff walked into when he was assigned to the defendant's facility in York.  There are conflicts in testimony that need to be resolved and credibility must be weighed on the issue of constructive notice.  Thus, the defendant's motion for summary judgment will be denied.

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment (Doc. 31) will be denied.  An appropriate order follows.

Date: 9/18/24

JUDGE JULIA K. MUNLEY
United States District Court